**KELLER BENVENUTTI KIM LLP**
JANE KIM (Cal. Bar No. 298192)
(jkim@kbkllp.com)
GABRIELLE L. ALBERT (Cal. Bar No. 190895)
(galbert@kbkllp.com)
TYLER DAVIS (Cal. Bar No. 338117)
(tdavis@kbkllp.com)
101 Montgomery Street, Suite 1950
San Francisco, California 94104
Telephone: (415) 496-6723
Facsimile: (650) 636-9251

*Proposed Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SANTA ROSA DIVISION**

| | |
|---|---|
| In re:<br><br>SIGNORELLO ESTATE LP, *et al.*,[1]<br><br>Debtors. | Case No. 26-10655 (DM)<br><br>(Joint Administration Requested)<br><br>Chapter 11<br><br>**DECLARATION OF RAYMOND SIGNORELLO IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS** |

[1] The last four digits of Signorello Estate LP's tax identification number are 1655. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Signorello. The Debtors' service address is 4500 Silverado Trail, Napa, CA 94558.

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

I, Raymond Signorello, declare as follows:

1. I am the owner and proprietor of Signorello Estate LP, a California limited partnership ("Signorello Estate"), and certain of its affiliates that are debtors and debtors in possession (collectively, the "Debtors").

2. I joined Signorello in the 1980s and have been the sole owner since 1995. I am generally familiar with the day-to-day operations of the Debtors and their affairs, books, and records.

3. I submit this declaration pursuant to 28 U.S.C. § 1746 in support of the First Day Motions (as defined below). Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management, employees, and professionals, or learned from my review of relevant documents or upon my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized by the Debtors to submit this declaration.

4. On August 27, 2026 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California, thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases"). The Debtors are operating their businesses and managing their assets as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

5. To minimize the adverse effects of filing for bankruptcy protection on their business, the Debtors have filed motions requesting various types of "first day" relief (collectively, the "First Day Motions"). The First Day Motions seek relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors-in-possession. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, (b) constitutes a critical element in achieving a successful resolution to these Chapter 11 Cases, (c) best serves the Debtors'

estate and creditors' interests, and (d) is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

6. Part I of this declaration describes the Debtors' businesses, their secured debt, and the circumstances surrounding the commencement of these Chapter 11 Cases. Part II summarizes the relief requested in each First Day Motion and the facts supporting those requests.

## I. BACKGROUND AND EVENTS LEADING UP TO CHAPTER 11

### A. Overview of Debtors' Businesses and History

7. In 1977, my father, Ray Signorello, Sr., purchased approximately 116 acres[2] on the Silverado Trail in Napa Valley and developed the property into a vineyard and wine estate, and the Debtors continue to operate on that property. The first Signorello Estate wine was produced in 1985, a Chardonnay made from estate grapes, and the original Signorello Estate winery was subsequently developed and completed in 1988.

8. I entered the family business in the late 1980s. What began as a family vineyard and winemaking project became my principal professional focus. After my father's retirement, I became the Debtors' sole owner in 1995 and continued to develop the estate and expand the family's wine activities. The winery eventually developed a direct-to-consumer hospitality and wine-sales business in addition to wholesale and distribution channels.

### B. Debtors' Corporate Structure, Business, and Assets

9. A corporate organizational chart is attached hereto as **Exhibit A**. When I assumed ownership, I operated Signorello Estate as a sole proprietorship. In 2024, I formed Signorello Estate LP, in which I own a 99% interest, and transferred all assets to that entity. Signorello Estate operates the original winery and business and represents the flagship, ultra-premium component of the Debtors' portfolio. Signorello Consulting Inc., a British Columbia corporation that I formed and wholly own, owns the remaining 1% interest and serves as Signorello Estate's general partner. The 1% ownership interest in Signorello Estate constitutes substantially all of Signorello Consulting's assets.

---

[2] Over the years, the Debtors sold 60 acres of the original plot and currently own a single plot of approximately 56 acres.

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

10. R.E.S., Inc. (which does business in California under the name "Mersualt Inc."[3]) and Walrus, Inc. are Nevada corporations for which I am the president and that own the underlying real estate associated with Signorello Estate. Each owns a 50% interest in the land at 4500 Silverado Trail. Walrus, Inc. also owns an interest in Desert Masa Land Partners in Nevada. Both R.E.S., Inc. and Walrus, Inc. are owned by irrevocable trusts for the benefit of my children and I am the president of the board of directors for each trust. Signorello Estate operates on the property on the Silverado Trail pursuant to a long-term ground lease and owns the winery buildings and improvements, brand, inventory and the operating assets associated with Signorello Estate.

11. In order to diversify the Debtors' offerings and customer base, the Debtors eventually added three more brands, Edge Wines, S Wines, and Trim Wines, to their portfolio. Under my leadership, the Debtors created these three brands to complement Signorello Estate and allow the overall enterprise to participate in different segments of the wine market. Each was created with a distinct product, price point, sourcing strategy and customer base. This allowed us to expand our business without diluting the premium positioning of Signorello Estate.

12. Northern Empire LLC, a California limited liability company, owns the Edge Wines business and brand. I founded, am the manager of, and own 66.7% of the stock of Edge Wines. It was founded in 2001 to produce a high-quality, value-oriented Cabernet Sauvignon at a price point substantially below that of Signorello Estate. Edge Cabernet is currently sourced from Alexander Valley in Sonoma County and retails for approximately $28 per bottle.

13. Napa Wine Partners LP,[4] a California limited partnership, owns the S Wines business and brand. Fused Wines LLC, a California limited liability company, serves as the general partner of Napa Wine Partners LP. I established Fused Wines in 2006 as a Napa Valley Cabernet Sauvignon project priced at approximately $50 per bottle. After producing Fused for a number of years, I discontinued the Fused brand but continued the underlying business and transitioned its focus to S Wines. Beginning with the 2019 vintage, S Wines has focused on

---

[3] When R.E.S., Inc. registered to conduct business in California, the R.E.S., Inc. name was not available in California.

[4] Napa Wine Partners LP was originally named Fused Wines LP.

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

producing a high-quality Napa Valley Cabernet Sauvignon retailing for approximately $90 per bottle, providing a premium Napa Cabernet offering at a per bottle price below that of Signorello Estate.

14. Finally, Trim Wines LLC, a California limited liability company, owns the Trim Wines business and brand. I founded, am the manager of, and own 65.35% of the stock of Trim Wines which was founded in 2009 to serve the entry-level segment of the wine market. Trim initially produced Cabernet Sauvignon and subsequently added Chardonnay. The Cabernet is sourced from Lodi and the Chardonnay from Mendocino County. Both currently retail for approximately $15 per bottle.

15. The portfolio's prices range from approximately $15 per bottle, for the entry-level Trim wines and $28 per bottle for Edge Cabernet, to $90 per bottle for S Cabernet, and ultimately to $100-250 per bottle for the ultra-premium estate wines produced by Signorello Estate. The separate brands and entities allowed each business to maintain its own market positioning, sourcing strategy and customer base rather than attempting to stretch the Signorello Estate brand across widely different price categories.

16. In addition to the real property and winery equipment, the Debtors also own wine inventory in bottled and bulk form. Signorello Estate has bottled and bulk wine inventory while Northern Empire, Trim Wines and Napa Wine Partners have only bottled wine inventory.

17. The Debtors store their bottled wine inventory with Aldenbridge Logistics Solutions LLC (the "Warehouse") in American Canyon, California. The Warehouse currently holds inventory for all four wine brands: Signorello Estate, Northern Empire, Trim Wines and Napa Wine Partners.

18. WineShipping.com also holds some of Signorello Estate's inventory in its warehouse in Napa, California and ships bottled wine for the Debtors' direct to consumer sales.

19. 60% of Signorello Estate's bottled inventory is sold to distributors, including Costco, and 40% directly to consumers. Northern Empire, Trim Wines and Napa Wine Partners sell 99% of their inventory through distributors (including Costco for Northern Empire and Napa Wine Partners) and 1% directly to consumers.

### C. Challenges Faced by the Debtors and Events Leading Up to Chapter 11 Filing

20. The Debtors have faced significant difficulties over the past nine years, beginning on October 8, 2017, when the Atlas Peak wildfire destroyed the original Signorello Estate winery, hospitality center, house, offices and laboratory. Fortunately, the vineyards were largely spared, but the loss was a defining interruption to a business that had been developed over the previous four decades.

21. Rather than abandon the property or the enterprise, the Debtors immediately committed to rebuilding. The rebuilding process required architectural design, pre-construction planning, permitting and ultimately a complete reconstruction of the winery and hospitality operation. A temporary hospitality facility was used for approximately six years while the property was rebuilt.

22. The rebuilding process was unusually long and expensive. The permitting process in Napa Valley took approximately three years. Construction then proceeded through the COVID-19 pandemic, when supply-chain disruptions, labor constraints, material costs and construction timelines significantly increased the cost of rebuilding. The final construction cost was approximately twice the original budget.

23. The rebuilding cost was not the only financial difficulty the Debtors faced during that time. The 2017 fire resulted in a prolonged insurance dispute and litigation, which led to substantial legal and other costs, culminating in an unfavorable settlement. The Debtors also experienced the loss of a substantial portion of their restaurant-driven business during the COVID-19 pandemic.

24. The Company suffered another major setback in 2020, when smoke taint from major wildfires affected the harvest. Signorello Estate was limited to bottling a single varietal that year because smoke had ruined the rest of the grapes.

25. At the same time, the broader wine industry began to experience significant structural and economic difficulty, which continues to plague the industry to this day. Demand weakened in important channels, production and operating costs increased, and the business

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

environment became significantly more challenging, just as the Debtors were completing their major capital reconstruction.

26. The rebuilt Signorello Estate reopened in June 2024. The new facility includes modern production, hospitality and cellar infrastructure, including a large underground cave and production facilities designed to support both the Debtors' production and additional winery capacity.

27. The timing of the reopening was exceptionally difficult. Rather than reopening into the stronger market conditions contemplated when the project was conceived, the Debtors reentered the market at a time when the entire California wine market had declined and demand had decreased significantly from pre-COVID levels. This affected both the ability to grow existing brands and the availability of third-party custom-crush clients needed to utilize the added production capacity at the rebuilt facility.

28. The Canadian market has historically been an important part of the Debtors' broader wine activities. Through the Canadian import and distribution business, the Debtors marketed their own wines as well as wines from international producers. The decline of U.S. wine sales in Canada, including as a result of increased tariffs or embargos on American wine, removed an important export market at a particularly difficult point for the Debtors.

29. At the same time, the carrying cost of the reconstruction debt increased substantially as interest rates rose. The Debtors originally obtained financing for the construction at a favorable interest rate, but as a result of the challenges described above, and as further detailed below, the cost of servicing the debt, including default interest, penalties, and other lender charges, further increased the financial burden. These financing pressures became unsustainable for a newly rebuilt winery that was still in the process of reestablishing its production, hospitality and direct-to-consumer businesses.

**D. The Debtors' Prepetition Secured and Unsecured Debt**

30. In order to rebuild after the Atlas Fire, on or about July 20, 2018, I, as the sole proprietor of Signorello Estate, entered into a certain Master Loan and Membership Agreement (as amended from time to time, the "Master Loan Agreement") with American AgCredit ACA

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

("ACA") and its subsidiaries American AgCredit, FLCA ("FLCA") and American AgCredit, PCA ("PCA," and together with ACA and FLCA, "AgCredit") as lenders. Pursuant to the Master Loan Agreement, AgCredit has made six loans to me, with the Debtors as guarantors, in initial principal amounts of $29,190,000, in the aggregate, which include: (i) that certain loan made by FLCA on or about July 20, 2018, in the initial principal amount of $1,690,000.00 (Loan No. 009000056461, the "First FLCA Loan"); (ii) that certain loan made by FLCA on or about November 22, 2021, in the initial principal amount of $13,750,000.00 (Loan No. 009002065426, the "Second FLCA Loan"); (iii) that certain loan made by FLCA on or about June 8, 2023, in the initial principal amount of $5,750,000.00 (Loan No. 009002084725, the "Third FLCA Loan"); (iv) that certain loan made by FLCA on or about June 8, 2023, in the initial principal amount of $4,000,000.00 (Loan No. 009002087392, the "Fourth FLCA Loan"); (v) that certain loan made by PCA on or about April 5, 2024, in the initial principal amount of $3,000,000.00 (Loan No. 009002099514, the "First PCA Loan"); and that certain loan made by PCA on or about April 5, 2024, in the initial principal amount of $1,000,000.00 (Loan No. 009002100914, the "Second PCA Loan," and together with the First FLCA Loan, the Second FLCA Loan, the Third FLCA Loan, the Fourth FLCA Loan, and the First PCA Loan, collectively, the "Loans").

31. In connection with the Loans, the Debtors provided AgCredit with blanket liens on substantially all of their assets. AgCredit filed UCC-1 financing statements in the applicable jurisdictions.

32. On or about July 18, 2024, the Debtors and I entered into a forbearance agreement with FLCA (the "First Forbearance Agreement"), as a result of the Debtors' alleged breaches and defaults, which included failure to pay the amounts owed under the Loans. Under the First Forbearance Agreement, FLCA agreed to forbear from taking action as a result of the alleged defaults until October 1, 2024, in exchange for certain forbearance and performance fees and the execution of other instruments, documents, and agreements, including additional guaranties and securities agreements.

33. As of October 1, 2024, the Debtors had not cured the defaults that were subject to the First Forbearance Agreement, and two of the six Loans matured and become fully due and

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

payable. As a result of the failure to make payments due to FLCA under its Loans and failure to pay PCA's Loans in full, AgCredit declared further defaults of all the Loans and related loan documents, accelerated all unpaid indebtedness owed under the Loans, and demanded payment in full from the Debtors and myself.

34. On or about October 17, 2025, the Debtors and I entered into a second forbearance agreement and general release (the "Second Forbearance Agreement") with AgCredit, in order to provide the Debtors with the opportunity to market and sell the collateral securing the Loans to facilitate the full repayment of the Loans.

35. The Second Forbearance Agreement provided a forbearance through March 2, 2026. As of the Petition Date, the Loans remain in default and outstanding in the total asserted amount of approximately $36,318,412.85.

36. In addition to the AgCredit secured debt, Wells Fargo Bank N.A. holds a lien against equipment owned by Signorello Estate. Finally, there is a lien recorded by Purple Wines, Inc. but there is no remaining underlying obligation.

**E. The Sale Process and Notice of Trustee Sale**

37. As part of the consideration for the Second Forbearance Agreement, among other things, the Debtors agreed to retain (i) John Hawkins to serve as Chief Restructuring Officer to, among other things, oversee the ongoing operations, execute a wind-down plan, including the sale process described below, and coordinate directly with BMO (defined below) and AgCredit regarding the sale process, and (ii) BMO Capital Markets Corp. ("BMO") as investment banker to advise the Debtors and market the Debtors' business and assets for sale or investment that would repay the Loans.

38. As soon as the Second Forbearance Agreement was signed in October 2025, BMO and the Debtors conducted a phased marketing process designed to retire AgCredit's debt, satisfy other liabilities, fund ongoing operations, and maximize value. After an initial targeted outreach to 39 high-priority prospects, BMO expanded the process to 119 potential buyers, including 85 strategic buyers and 34 sponsors or family offices; 51 parties executed non-disclosure agreements and received confidential information materials.

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

39. The process produced significant diligence activity, including multiple site visits between February and July 2026, and resulted in three formal indications or letters of interest. Despite this board marketing effort, none of the proposals came close to repaying AgCredit's loans, and AgCredit informed the Debtors that the prices offered were not acceptable. Indeed, none of the proposals obtained through BMO's sale process exceeded $15 million for all of the Debtors' assets.

40. When the BMO sale process did not result in a transaction acceptable AgCredit, AgCredit started foreclosure proceedings. On April 17, 2026, AgCredit issued two notices of default filed in Napa County, numbers 2026-0005539 and 2026-0005540, and on July 23, 2026, it issued a Notice of Unified Trustee's Sale (the "Foreclosure Sale"). The sale was originally scheduled on August 21, 2026, but AgCredit continued the Foreclosure Sale until August 28, 2026, to allow negotiations between AgCredit and the Debtors to continue.

41. After the BMO sale process did not produce a transaction acceptable to AgCredit, the Debtors continued to pursue alternatives that could preserve value, maintain momentum, and provide a realistic path toward a sale of the winery and estate. Those efforts were undertaken against the backdrop of an imminent foreclosure sale and significant financial pressure, making it essential that the Debtors identify a transaction structure that could be presented promptly and credibly while also preserving the opportunity for continued marketing and competitive bidding through a court-supervised process.

42. The Debtors' efforts resulted in the identification of Amar Doman and Ashley Cooper, two high net-worth individuals who are, together, the stalking horse buyer (jointly, the "Stalking Horse Buyer") and the DIP Lender. On August 24, 2026, the Stalking Horse Buyer submitted to the Debtors a letter of intent (the "August 24 LOI") to purchase the Debtors' assets for a purchase price of $16 million, subject to the terms and conditions that were set forth in the August 24 LOI. That price was higher than any offer received through the BMO sale process. The Debtors, upon receiving the August 24 LOI, promptly presented the August 24 LOI to AgCredit. On August 25, 2026, AgCredit declined to engage with the Stalking Horse Buyer or provide a written or formal counter to the August 24 LOI.

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

43. Because AgCredit would not provide a counter-bid or negotiate with the Stalking Horse Buyer, and because the Stalking Horse Buyer informed the Debtors that they did not think it appropriate to bid against itself, and with the looming Foreclosure Sale scheduled to take place on August 28, 2026, the Debtors had no choice but to negotiate with the Stalking Horse Buyer regarding providing debtor-in-possession financing and submitting a stalking horse bid in these Chapter 11 Cases.

44. The Stalking Horse Buyer therefore agreed also to be a DIP Lender on the terms set forth in the Term Sheet and further described in the DIP Financing Motion, and the Stalking Horse Buyer, as DIP Lender, and the Debtors executed the Term Sheet on August 27, 2026. The Stalking Horse Buyer also informed the Debtors that it would submit a revised letter of intent to purchase the Debtors' assets for a purchase price of up to $20 million (the "Stalking Horse Offer"), comprised of $16.5 million in cash plus a credit bid of the DIP Obligations. The Debtors intend to file a motion to approve the bid of the Stalking Horse Buyer and to establish bid procedures shortly after they receive and accept the Stalking Horse Offer, subject to Court approval and higher and better bids.

**F. Necessity of the Bankruptcy Filing**

45. Allowing the Foreclosure Sale to proceed would have eliminated the opportunity to preserve and potentially increase the Debtors' value through a Court-supervised sale process or to preserve the Debtors' operations as a going concern. Current market conditions have depressed the wine industry, particularly in California, and have therefore impaired the value of the Debtors' enterprise. Therefore, I understand that an immediate foreclosure sale is unlikely to capture the full long-term value of the winery, estate, rebuilt production operations, hospitality operations, brand equity, and related assets. Chapter 11, by contrast, permits the Debtors to use the Stalking Horse Offer, which will be for the Debtors' assets and operating businesses, as a baseline while preserving the ability to solicit, evaluate, and pursue higher or otherwise better bids for the benefit of creditors and other stakeholders.

46. The Debtors have identified a purchaser willing to negotiate toward a transaction, but AgCredit has refused to engage with any bidder. The Debtors have repeatedly requested either

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

a written counterproposal, a reserve price, or an in-person meeting with the, now, Stalking Horse Buyer, so that the true economic parties could confer directly. AgCredit has repeatedly declined those requests. AgCredit's position effectively has been that the Debtors must present an offer acceptable to AgCredit before AgCredit will engage in substantive negotiations, while AgCredit simultaneously declines to identify any reserve price or terms that would be acceptable. Not surprisingly, the Stalking Horse Buyer, as a practical and commercial matter, is unwilling to continue increasing its own offer in the absence of meaningful engagement from AgCredit.

47. That uncertainty left the Debtors without a viable out-of-court mechanism to bridge the gap between the parties' positions, all under the impending shadow of the Foreclosure Sale. The Debtors then made clear to AgCredit that, absent meaningful engagement, they would have no choice but to file bankruptcy petitions and obtain debtor-in-possession financing, resulting in additional delay, expense, and uncertainty. Still, AgCredit declined to engage in negotiations or provide a written counterproposal that the Debtors could share with the Stalking Horse Buyer. This left the Debtors and the Stalking Horse Buyer without a means to find a negotiated out-of-court resolution. The Debtors determined that they would need the protections and structure of chapter 11 to create an open process in which AgCredit will be required to articulate what it deems acceptable and the Debtors can pursue value-maximizing negotiations. For that reason, the Debtors are before the Court. Although AgCredit may ultimately approve or reject a sale, the Debtors believe there is a price that AgCredit should accept in lieu of foreclosure, given the substantial loss of value that foreclosure would cause.

48. The Debtors' objective is therefore to obtain Bankruptcy Court approval of a sale process centered on the Stalking Horse Offer so that the winery and estate can be transferred as a going concern, the rebuilt production and hospitality operations can be monetized, and the jobs associated with those operations can be protected. The Debtors intend to negotiate with the Stalking Horse Buyer to enter into definitive documentation on the Stalking Horse Offer, which the Debtors believe provides the most realistic path to preserve estate value, avoid the loss of a business developed over decades, and ensure that any higher or otherwise better bids are tested and evaluated through a fair, transparent, and court-supervised process.

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

49. The Debtors also hope that, in this forum, AgCredit will do what it did not do outside of bankruptcy, and negotiate with the Debtors and the Stalking Horse Buyer so that the parties can try to reach an acceptable price.

## II. FIRST DAY MOTIONS

### A. DIP Financing Motion

50. By the *Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Secured Financing Pursuant to Section 364 of the Bankruptcy Code; (II) Authorizing The Use Of Cash Collateral; (III) Granting Superpriority Administrative Expense Claims; (IV) Scheduling A Final Hearing; And (V) Granting Related Relief* (the "DIP Financing Motion"), the Debtors seek entry of interim and final orders, authorizing the Debtors to obtain up to $3.5 million of secured, superpriority postpetition financing on the terms detailed herein. The interim order sought by the Debtors would approve the immediate borrowing and use of up to $1 million of financing for the initial draw (the "Interim DIP Loan"), on the terms described herein, in order to enable the Debtors to continue operating their businesses until a final hearing on the DIP Financing Motion (the "Interim Period").

51. The Debtors require debtor-in-possession financing because, without immediate and reliable access to postpetition liquidity, they will be unable to preserve their business operations, maintain the value of their assets, administer these Chapter 11 Cases, and pursue the sale process that offers the best opportunity to maximize value for creditors and other stakeholders. That need is especially urgent because the Debtors are in the process of harvesting grapes from the vines. Completing the harvest is necessary not only to collect the fruit, but also to maintain the health and viability of the vines and preserve the value of the vineyard. The proposed DIP budget therefore reflects a measured and necessary liquidity bridge for a six-month case timeline, including funding for ongoing operations, restructuring expenses, professional fees, required reserves, and orderly administration of the estates. The requested financing is not merely beneficial; it is essential to prevent deterioration of estate value while the Debtors seek to consummate a value-maximizing transaction through these Chapter 11 Cases.

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

52. The Debtors' management and advisors solicited indications of interest from lenders that regularly provide financing to debtors in possession. In total, the Debtors contacted nine potential DIP lenders, including AgCredit. Because the Debtors' property is already subject to senior secured debt, the Debtors have limited unencumbered assets available to serve as collateral for debtor-in-possession financing. I understand that no third-party lender was willing to extend credit on terms as favorable as those offered by the DIP Lender, and AgCredit declined to provide DIP financing as well.

53. The Debtors ultimately selected the DIP Lender because the Term Sheet, as finally negotiated, provides the most favorable financing available under the circumstances, taking into account cost, certainty of funding, the Debtors' collateral limitations, and the reduced risk of objections from parties in interest in connection with approval of the DIP Loans.

**B. Cash Management Motion**

54. By the *Motion of Debtors for Interim and Final Orders (I) Approving Continued Use of Debtors' Cash Management System and Bank Accounts; (II) Authorizing the Debtors to Open and Close Bank Accounts; and (III) Authorizing Banks to Honor Certain Prepetition Transfers* (the "Cash Management Motion"), the Debtors seek entry of Interim and Final Orders (i) approving the Debtors' use of their current Cash Management System and existing Bank Accounts and waiving certain requirements set forth in the operating guidelines issued by the Office of the United States Trustee for Region 17, which includes the Northern District of California (the "UST Guidelines"); (ii) authorizing, but not directing, the Debtors to open and close Bank Accounts; and (iii) authorizing, but not directing, all Banks to honor certain prepetition transfers.

55. As of the Petition Date, the Debtors maintain a cash management and disbursement system in the ordinary course of their operations—the Cash Management System.

56. Attached as Exhibit C to the Cash Management Motion is a chart describing the flow of funds through the Debtors' Cash Management System. Attached as Exhibit D to the Cash Management Motion is a schedule of the Debtors' WestAmerica (defined below) Bank Accounts

in existence as of the Petition Date. A description of the Debtors' Bank Accounts, with the last four digits of each account number in parentheses, is set forth below.

**1. The Bank Accounts**

57. The Debtors' four wine producing entities, Signorello Estate, Napa Wine Partners LP, Northern Empire LLC, and Trim Wines LLC (collectively, the "Wine Producers"), each have accounts, the Bank Accounts, open with WestAmerica Bank, N.A. ("WestAmerica Bank"). Signorello Estate's operating account (WestAmerica Bank Account 9107) (the "Main Operating Account") receives payments from its distributors and from direct-to-consumer sales. It uses this account to pay operating expenses, including payroll for all of the Debtors' employees. The Debtors use an Intuit Quickbooks product to process and pay the payroll. The Quickbooks product extracts payroll taxes at the same time it pulls cash for payroll from the Main Operating Account. The point-of-sale system used for direct-to-consumer sales is e-Cellars. Sales are processed through e-Cellars and deposited into the Main Operating Account.

58. Napa Wine Partners (WestAmerica Bank Account 3060), Northern Empire (WestAmerica Bank Account 8997), and Trim Wines (WestAmerica Bank Account 7459) each have operating Bank Accounts in their names. These accounts collect payments from their distributors and use them to pay each of their respective operating expenses.

59. The two Debtors that own the land on which the winery and vineyards sit, R.E.S. Inc. (WestAmerica Bank Account 8952) and Walrus Inc. (WestAmerica Bank Account 5010) (jointly, the "Landowners") also each have Bank Accounts open with WestAmerica Bank in their own names. These accounts collect rents from the Wine Producers and pay expenses.

60. Signorello Consulting Inc. ("Signorello Consulting") has two accounts at BMO ("BMO Canada Accounts") in British Columbia, Canada. Consequently, Signorello Consulting is requesting authority to close the BMO Canada Accounts within thirty days of the Petition Date. If needed, Signorello Consulting will open a new bank account at an institution that is an Authorized Depository.

61. The Wine Producers use checks, ACH, wires and Bill.com (the "Payment Processor") to pay their expenses. When payments are made by the Payment Processor, the total

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

of all payments is pulled from the appropriate Bank Account and flows through the Payment Processor's account (the "Payment Account"). When all the payments have been made by the Payment Processor to the vendors, the accounts re-sync, the Payment Account is cleared, and individual payments are posted to the corresponding Bank Account. The Payment Account is reconciled regularly to assure that it zeros out and all postings are correct in the appropriate Wine Producer's Bank Accounts.

62. The Wine Producers make intercompany transfers to move excess cash from one company to another as needed, with intercompany payables and receivables noted accordingly. When that happens, the transfers are booked in each Wine Producer's Bank Account and interest accrues at the Debtors' prepetition secured lender AgCredit's then-current market interest rate. The Landowners do not participate in these intercompany transfers, nor do they transfer funds between each other's Bank Accounts.

63. The Debtors anticipate that it may become necessary and appropriate to consolidate and close certain Bank Accounts during these Chapter 11 Cases. However, doing so prematurely would cause receipts to be denied or deferred, payments (including those payments that the Debtors seek authorization to make by the First Day Motions) would be rendered untimely because of administrative delays, and the efficiency and efficacy of the Debtors' operations would be negatively impacted. Accordingly, while the Debtors may later elect to simplify their Cash Management System, requiring them to do so immediately will cause unnecessary burden on the estates and put at risk the timely collection of cash and the timely payment of important obligations, including employee payrolls.

**2. Cash Management System Fees**

64. From time to time, and in the ordinary course of business, the Debtors incur obligations for the maintenance of the Cash Management System. These obligations primarily consist of (a) amounts owed to WestAmerica Bank for the maintenance of and services related to WestAmerica Bank Accounts ("Bank Fees"), together with other fees and obligations relating to the maintenance of the Cash Management System (together with the Bank Fees, the "Cash Management Fees"). The Cash Management Fees for the Bank Accounts are withdrawn from

each of those accounts on or around the 15th day of the month following the month for which fees are accrued. The total of the WestAmerica Bank Fees averages approximately $470 per month. The Debtors estimate that, other than the September Cash Management Fees scheduled to be paid on September 15, 2026, there are no accrued, unpaid, and undisputed prepetition amounts outstanding as of the date hereof on account of the Cash Management Fees ("Cash Management Claims"). To safely pay all Cash Management Claims, the Debtors seek authorization to pay any Cash Management Claims, up to $750 on an interim basis.

**3. Checks**

65. In the ordinary course of business, the Debtors issue checks from time to time (the "Checks"). To minimize the expense to the Debtors' estates associated with developing and/or purchasing entirely new checks or otherwise complying with Bankruptcy Local Rule 2015-1(a), the delay in conducting business prior to obtaining such forms, and the confusion of suppliers and other vendors, by the Cash Management Motion, the Debtors seek authority to continue using their Checks substantially in the forms used immediately prior to the Petition Date, without reference therein to the Debtors' status as "Debtor in Possession." The Debtors do not believe that any prejudice will be suffered by any party if this relief is granted.

**C. Employee Wages Motion**

66. By the *Motion of Debtors for Interim and Final Orders Authorizing (A) Payment of Prepetition Employee Wages, Benefits, and Related Items; and (B) Continuation of Certain Employee Benefit Programs in the Ordinary Course* (the "Employee Wages Motion"), the Debtors request entry of Interim and Final Orders authorizing the Debtors to pay: (i) prepetition wages, salaries, commissions, accrued leave benefits, and other accrued compensation, including any Prepetition Deductions (as defined below) (collectively, the "Prepetition Compensation"); (ii) premium payments owed for prepetition coverage under the Debtors' health benefits plan and other prepetition contributions to employee benefit plans and programs (collectively, the "Prepetition Benefits"); (iii) Payroll Tax Obligations (as defined below); and (iv) unreimbursed and unpaid reimbursable expenses (collectively, the "Reimbursable Expenses"); and (B) authorizing, but not directing, the Debtors to continue the Employee Benefit Programs (as

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

defined below, and together with the Prepetition Compensation, the Prepetition Benefits, the Payroll Tax Obligations and the Reimbursable Expenses shall be referred to herein as the "Prepetition Employee Obligations") in the ordinary course. To the Debtors' knowledge, no Employee is owed Prepetition Compensation (including accrued PTO) that exceeds the Section 507 Cap (as defined below).

**1. Prepetition Compensation**

67. The Debtors maintain a small workforce, and their employees are critical to maximizing the value of the Debtors' estates for the benefit of their creditors, because the Debtors seek to sell their assets and businesses as a going concern through these Chapter 11 Cases. The employees' skills, knowledge, and understanding of the Debtors' infrastructure, operations, assets, brands, and sales strategy are essential to the continued operation of the Debtors' business and therefore successful sale of the Debtors' business and assets. Without them, the Debtors would have no way to realize, let alone maximize, the value of their assets or to maintain the Debtors' vineyards.

68. As of the Petition Date, the Debtors have eight full-time employees (the "Employees"). The Employees comprise the Debtors' winemaker, cellar master, vineyard workers, and estate ambassador, and are all located in California. As such, the Debtors currently employ a barebones workforce, all of whom are critical to the Debtors' continued operations and necessary to maintain and preserve the Debtors' vineyards, winemaking operations, sales contracts and other assets that the Debtors propose to sell in these Chapter 11 Cases.

69. Of the Debtors' Employees, six are paid hourly and two are paid a salary (the "Base Wages"), and their compensation is structured to align with their specific roles within the organization. In addition, the Debtors' Estate Ambassador is eligible to receive sales commissions from tasting room and outbound sales (2%) and membership sign-ups ($50-75 per membership), gratuity (90%), and sales bonuses for achieving certain monthly sales goals ($500 to $1,000) (the "Commission Wages," and, together with the "Base Wages," the "Wages"). Commission Wages are calculated after the end of each month and paid out with the second payroll of the following month.

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

70. The Employees are paid bi-weekly on the second and fourth Thursday of each month for the two-week period ending on the preceding Sunday. On August 27, 2026, prior to filing these Chapter 11 Cases, the Debtors paid all Base Wages accrued as of August 23, 2026, in their regularly scheduled payroll (the "Prepetition Payroll Date"). No Commission Wages were owed for the month of July and, therefore, no Commission Wages were included in the payroll. The next scheduled payroll date is September 10, 2026. As of the Petition Date, the Employees have accrued unpaid prepetition Base Wages in the aggregate amount of approximately $7,596.62, and unpaid prepetition Commission Wages are estimated to be $500 in the aggregate. However, the Debtors do not believe that any Employee has accrued unpaid prepetition Wages exceeding the priority amount for employee wages under section 507(a)(5) (the "Section 507 Cap").

71. The Employees are critical to maximizing the value of the Debtors' estates for the benefit of their creditors because their skills, knowledge, and understanding of the Debtors' vineyards, operations, and sales strategy are essential to maximizing the value of the estates.

72. The continued service of the Employees is vital for several reasons, including, among others:

> Management of Vineyard Operations and Winemaking: The Employees provide the necessary expertise required to maintain the vines and to produce and store the Debtors' wine until bottled.
>
> Maintaining Revenue Streams: The sales-related Employees maintain critical relationships with customers and merchants, preventing a collapse of revenue and brand reputation, which would occur if sales contracts were neglected prior to closing a sale of the Debtors' assets as a going concern.

Without the continued service of their Employees, the Debtors would have no way to realize, let alone maximize, the value of their assets.

73. As of the Petition Date, the Debtors' estimate that the Employees have accrued Wages in an aggregate amount of $8,096.62. The Debtors seek authority to pay such prepetition Wages up to the amount allowed under the Section 507 Cap, per Employee.

**i. Independent Contractors**

74. In addition to the Employees, in the ordinary course of business, the Debtors engage third-party independent contractors (collectively, the "Independent Contractors") and incur

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

payment obligations for services rendered in order to maintain minimal operational expenses. The Debtors retain a firm that provides financial and accounting services typically provided by a chief financial officer, two individuals that provide national and direct-to-consumer sales, service, and support, and one firm that serves as a vineyard consultant. The Debtors pay the Independent Contractors on a monthly basis upon receiving an invoice for their services. The Independent Contractors are not eligible to enroll in the Health Benefits (as defined herein) or any other benefits provided by the Debtors and further described in the Employee Wages Motion. The Debtors plan to continue to pay the Independent Contractors in the ordinary course for services rendered post-petition, but they do not seek authority to pay any prepetition amounts owed to the Independent Contractors.

**i. Paid Time Off**

75. The Debtors offer paid time off ("PTO") to their full-time Employees that work at least 32 hours per week. The Employees accrue PTO each pay period. PTO may be used for whatever personal reasons each Employee decides, including time off for vacation, illness, or religious occasions not on the Debtors' holiday schedule. Accrued but unused PTO is paid out upon termination, or as required by applicable law in California. As of the Petition Date, the Debtors' Employees have accrued unpaid PTO in an aggregate amount of approximately $21,299.48. The Debtors seek authority to pay such prepetition PTO up to the amount allowed under the Section 507 Cap, per Employee, to the extent it becomes payable due to an Employee's termination postpetition or as required by California law.

**i. Prepetition Deductions**

76. The Debtors take deductions from their Employees' paychecks to make payments on behalf of the Employees for or with respect to, among other things, the Debtors' Prepetition Benefits and amounts due to federal, state and local taxing authorities for the Employee Taxes (defined below). As of the Petition Date, the Debtors may be holding amounts deducted from their Employees' Prepetition Compensation that have not yet been remitted to the taxing authorities or benefits providers (collectively, the "Prepetition Tax and Benefit Obligations").

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

**a. Employee Benefit Programs**

77. In the ordinary course of business, the Debtors maintain certain benefits for their Employees, including medical benefits, certain leave benefits, such as pregnancy disability leave, baby bonding leave, bereavement leave, access to a 401K plan, and workers' compensation insurance (collectively, the "Employee Benefit Programs").

78. The Debtors' Employees are eligible to participate in the Debtors' health care benefit plans, which include health insurance through Kaiser Permanente, dental insurance through MetLife, and vision insurance through VSP. The Debtors pay up to $400 per month towards each Employee's elected health care insurance premiums. Employee premiums costing in excess of $400 a month require deductions from the Employee's payroll to cover the monthly cost in excess of the Debtors' contributed share. The Debtors pay the premium amounts owed under the health care benefit plans to the insurance providers, in advance, at the beginning of each month. Accordingly, the Debtors do not believe that any health care benefit plan premiums are owing as of the Petition Date.

79. The Debtors provide the Employees with various leave benefits. The Debtors provide job-protected, but unpaid, leave for Employees due to health conditions, pregnancy disability, jury duty, or being the victim of a serious crime. The Debtors also provide five days of paid bereavement leave days for the death of an Employee's immediate family member.

80. With respect to the 401(K) plan, Employees may elect to contribute amounts from each paycheck, before taxes, which are then invested by Merrill Lynch. The Debtors do not contribute to the Employees' 401(K) plan.

81. The Debtors pay insurance premiums for workers' compensation insurance (the "Workers' Compensation Program") on a bi-weekly basis, based on payroll, through their insurance brokers. As of the Petition Date, the Debtors estimate that the pro rata premium amount owed under the Workers' Compensation Program is approximately $1,214 in the aggregate.

**a. Payroll Tax Obligations**

82. The Debtors, as employers, are required by law to withhold federal, state, and local taxes (the "Employee Taxes") from wages for remittance to appropriate taxing authorities. These

withheld funds, to the extent that they are in the Debtors' possession, constitute monies held in trust and are not property of the Debtors' bankruptcy estates. In addition to the Employee Taxes, the Debtors are required to pay, from their own funds, social security and Medicare taxes and pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts for state and federal unemployment insurance (together with the Employee Taxes, the "Payroll Tax Obligations"), and to remit the same to the appropriate state and federal taxing authorities. The Debtors should be authorized to pay all Payroll Tax Obligations as they come due, including any obligations arising from payment of the Prepetition Compensation pursuant to the Interim and Final Orders on the Employee Wages Motion.

**a. Reimbursable Expenses**

83. The Debtors customarily reimburse their Employees for a variety of approved business expenses incurred by the Employees in the ordinary course of their businesses (the "Reimbursable Expenses"). To obtain reimbursement of business expenses, an Employee is required to submit original receipts with a completed expense reimbursement form no later than the last business day of each month. Once approved, reimbursements are paid directly to the Employee's bank account on the fifteenth day of the following month that the expenses are incurred. In a typical month, the Debtors reimburse Employees for approximately $500 of expenses in the aggregate.

84. It is likely that certain Employees have not been reimbursed for Reimbursable Expenses incurred prior to the Petition Date. It is difficult for the Debtors to determine the exact amount of Reimbursable Expenses that are outstanding because, among other things, Employees may not have submitted reimbursement forms for all accrued expenses. The Debtors do not expect that their obligations for Reimbursable Expenses as of the Petition Date will exceed $1,000 in the aggregate.

85. The Debtors request that they be authorized to reimburse all such expenses when the reports are submitted, in order to assure such Employees that they will be reimbursed for their actual out-of-pocket expenses incurred while acting within the scope of their employment. The Employees who have incurred Reimbursable Expenses on behalf of the Debtors should not be

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

forced to bear the cost of such expenses personally, especially because the Reimbursable Expenses were incurred for the Debtors' benefit, in the course of their employment or service, and with the understanding that they would be reimbursed.

**D. Tax Motion**

86. By the *Motion of Debtors for Interim and Final Orders Granting Authority to Pay Certain Prepetition Taxes and Assessments and Related Relief* (the "Tax Motion"), the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay prepetition Sales and Use Taxes (as defined herein) to the applicable federal, state, and local taxing authority (the "Tax Agencies"), and granting related relief.

87. In the ordinary course of their businesses, the Debtors collect sales taxes on account of the sale of wine (collectively, the "Sales Tax"). The Debtors incur use taxes from time to time on account of the purchase of certain equipment utilized by the Debtors in the ordinary course of business from vendors who do not collect sales tax (the "Use Taxes" and, together with the Sales Taxes, the "Sales and Use Taxes"). The Debtors remit such Sales and Use Taxes to the California Department of Tax and Fee Administration (the "CDTF") and Sales Taxes to various out-of state Tax Authorities (such Sales Taxes, the "Out-of State Sales Taxes," and such Tax Authorities, the "Out-of-State Tax Authorities").

88. The Debtors generally pay the Sales and Use Taxes annually, as required by applicable law. As of the Petition Date, the Debtors' estimate that an aggregate amount of approximately $2,725 in Sales and Use Taxes are owing to the CDTF. The Debtors' estimate that an aggregate amount of approximately $17,300 of Out-of-State Sales Taxes are also owed to Out-of-State Tax Authorities, for a total estimated amount of Sales and Use Taxes of $20,025 owing as of the Petition Date. The amounts of the Sales and Use Taxes above are good faith estimates based on the Debtors' books and records and remain subject to potential audits and other adjustments.

89. Many federal, state and local Tax Authorities impose personal liability on directors and/or responsible officers of entities responsible for collecting or paying certain taxes or fees in the event that such taxes or fees are not paid by the Debtors. Thus, if such taxes or fees remain

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

unpaid, the Debtors' directors and officers may be subject to lawsuits or even criminal prosecution on account of nonpayment during the pendency of these Chapter 11 Cases. Such lawsuits or proceedings would constitute a significant distraction for the Debtors' directors and responsible officers at a time when they should be focused on the Debtors' efforts to preserve and maximize value for all stakeholders.

90. Although the Debtors believe that any such taxes and/or assessments for which the Debtors' directors and/or responsible officers may be personally liable are described in the Tax Motion, it is possible that other prepetition obligations, which carry similar liability, may be uncovered by the Debtors subsequent to the filing of the Tax Motion.

91. I believe that payment of the Sales and Use Taxes is necessary to facilitate a successful liquidation in these Chapter 11 Cases. Moreover, I understand that the Sales and Use Taxes almost certainly constitute priority claims and, in certain instances, payment thereof will avoid the imposition of liens and the accrual of unnecessary interest and other charges.

**E. Utilities Motion**

92. By the *Motion of Debtors for Interim and Final Orders Establishing Adequate Assurance Procedures with Respect to the Debtors' Utility Providers* (the "Utilities Motion"), the Debtors seek entry of interim and final orders (i) establishing procedures for addressing any requests that a utility company (collectively, the "Utility Companies," and each, individually, a "Utility Company") may make for additional assurance of payment; (ii) prohibiting the Utility Companies from altering, refusing, discontinuing services to, or discriminating against the Debtors, (iii) approving an adequate assurance deposit as adequate assurance of post-petition payment to the Utility Companies; and (iv) granting certain related relief.

93. The Debtors rely on utility services, including but not limited to, telephone, internet, electricity, and waste removal (collectively, the "Utility Services") provided by the Utility Companies, including those identified on Exhibit C attached to the Utilities Motion (the "Utility Service List"), to operate their businesses.

94. Uninterrupted service from the Utility Companies is essential to administering these Chapter 11 Cases and maximizing the value of the Debtors' assets for the creditors. Any

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

temporary or permanent discontinuation of utility services could irreparably disrupt the orderly administration of these Chapter 11 Cases, damage the Debtors' assets, and, as a result, diminish recoveries to the Debtors' stakeholders and harm the Debtors' estates.

**F. Insurance Motion**

95. By the *Motion of Debtors for Interim and Final Orders Authorizing the Debtors to (A) Maintain Insurance Policies and Pay Obligations with Respect thereto; and (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies* (the "Insurance Motion"), the Debtors seek entry of interim and final orders authorizing the Debtors to (i) maintain the Insurance Policies (as defined herein); (ii) pay the Insurance Obligations (as defined herein); and (iii) renew, amend, supplement, extend, or purchase insurance in the ordinary course of business and consistent with prepetition practice.

96. In the ordinary course of business, the Debtors maintain multiple property and liability insurance policies that provide the Debtors with insurance coverage for claims relating to, among other things, real and personal property (including auto), commercial liability, workers' compensation, and health (collectively, the "Insurance Policies") through different insurance carriers (the "Insurance Carriers"), including, but not limited to, the Insurance Policies and Insurance Carriers identified in Exhibit C to the Insurance Motion.

97. The Debtors are required to pay, either directly or through the Debtors' insurance brokers, premiums for coverage under the Insurance Policies (collectively, the "Insurance Premiums"). The Insurance Premiums are based upon a fixed rate established and billed by each Insurance Carrier. The premiums for the Insurance Policies are determined annually and are paid in monthly installments. Under the terms of the Insurance Policies, the Debtors pay total monthly payments of approximately $8,218.00, in the aggregate, rather than paying the entire amounts, of approximately $95,000.00, upfront. Continuing to perform and make payments under the Insurance Policies in the ordinary course of business on a postpetition basis is essential for the maintenance of the Insurance Policies and receipt of benefits under the Insurance Policies and is in the best interest of the Debtors' estates.

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

98. As of the Petition Date, the Debtors have paid all installments owed under the Insurance Policies. The Debtors do not believe that any premiums under the Insurance Policies are due and owing. However, it is possible that the Debtors may identify outstanding prepetition insurance obligations (the "Prepetition Insurance Obligations") as of the Petition Date. Accordingly, the Debtors request authority to pay all Prepetition Insurance Obligations, in a total amount not to exceed $8,218, if and to the extent necessary to continue in good standing under the Insurance Policies, and to pay related postpetition obligations due in the ordinary course.

99. Further, and more critically, certain of the Insurance Policies will expire imminently (the "Expiring Policies"), as provided below:

| Insurance Policies | Expiration Date |
|---|---|
| Property (PWFXS0053903) | September 22, 2026 |
| General Liability (PWPKG0002205) | September 22, 2026 |
| Umbrella / Excess (PWPRP0003600) | September 22, 2026 |

100. The renewal and continuation of the Expiring Policies is critical to a successful administration of these Chapter 11 Cases and is required of chapter 11 debtors, as discussed below (the "Immediate Post-Petition Insurance Obligations" and, with the Prepetition Insurance Obligations, the "Insurance Obligations"). Therefore, the Debtors request authority to renew, amend, supplement, or modify the Expiring Policies, as needed, and to pay the premiums associated with the Expiring Policies when they become owing and due.

101. The Debtors draw upon funds in their disbursement accounts to satisfy their obligations arising from the Insurance Policies. The Debtors request that the Court authorize the Bank to receive, honor, process, and pay any and all checks drawn, or electronic fund transfers requested or to be requested, on the disbursement accounts to the extent that such checks or electronic fund transfers relate to any Insurance Obligations.

102. The Debtors believe that payments made in connection with the Insurance Policies and any fees associated therefrom (including broker fees), are essential to ongoing operations, fall within the Debtors' ordinary course of business and, in any event, are in the best interests of the Debtors, their estates, and their creditors.

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

### G. Shippers and Warehouse Motion

103. By the *Motion of Debtors for Interim and Final Authority to Pay (I) Prepetition Obligations Owed to Shippers, Warehousemen, and Other Lien Claimants and (II) Related Excise Taxes* (the "Shippers and Warehouse Motion"), the Debtors seek interim and final orders authorizing the Debtors to pay the prepetition claims (the "Lien Claims") of certain third-party shippers and warehousemen that may be permitted to assert statutory or possessory liens against the Debtors' property if the Debtors fail to pay the prepetition amounts owed to those parties for their various goods and services (collectively, the "Lien Claimants"), authorizing the Debtors to pay the related excise taxes (the "Tax Claims"), and authorizing the Debtors to pay such obligations in the ordinary course of business.

104. In the ordinary course of operating their wine businesses, the Debtors routinely transact business with shippers and warehousemen who may be permitted to assert statutory or possessory liens against the Debtors' property if the Debtors fail to pay the Lien Claims. The Lien Claimants are (i) Aldenbridge Logistics Solutions LLC ("Aldenbridge") and (ii) WineShipping.com ("WineShipping"). The Lien Claimants store bottled wine inventory (the "Stored Wine") and ship it to the Debtors' customers and distributors. Aldenbridge currently holds Stored Wine for Signorello Estate, Northern Empire, Trim Wines and Napa Wine Partners in its warehouse in American Canyon, California. WineShipping.com holds Signorello Estate bottled wine in its warehouse in Napa, California, which it ships directly to consumers.

105. As of the Petition Date, the Debtors estimate that they owe approximately $51,671 on account of Lien Claims, $51,221 owed to Aldenbridge and $450 owed to WineShipping, on account of warehousing and shipping the Debtors' wine inventory, all of which will come due in the first fifteen days of the Chapter 11 Cases.

106. If the Debtors fail to pay the Lien Claimants in a timely manner, I understand that the Lien Claimants may seek to assert statutory or possessory liens against Stored Wine that is in their possession, potentially blocking the Debtors' access to the Stored Wine and ability to sell and ship the Stored Wine, which would have a significantly detrimental impact on the Debtors' revenue and businesses. In addition to having secured claims, if the Debtors are unable to satisfy the Lien

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

Claims as requested herein, I also understand that the Lien Claimants may refuse to provide ongoing storage or shipping to the Debtors or may seek to enforce their rights and liens on account of such claims.

107. In addition to storage and shipping services, the Lien Claimants pay excise taxes to the appropriate taxing authority (the "Taxing Authorities")[5] when product is sold within that jurisdiction. The Lien Claimants collect the taxes from the Debtors and forward those taxes to the authority for the state to which the Stored Wine is shipped. As of the Petition Date, the Debtors estimate that they owe approximately $5,118 to Aldenbridge and $0 to WineShipping on account of the Tax Claims. By paying the Taxing Authorities directly, the Lien Claimants save the Debtors the administrative expense of tracking and calculating the amount due to each Taxing Authority at any given time. Because the Debtors sell the Stored Inventory in all 50 states, this service saves significant administrative expense. For Stored Wine shipped to the state of Missouri, the Debtors must pay the Missouri Department of Revenue ("Missouri") directly. As of the Petition Date, the Debtors believe that they owe $0 to Missouri on account of the Tax Claims.

108. To minimize the disruption that the Debtors' business operations will suffer if prepetition obligations owed to Lien Claimants are not paid, by the Shippers and Warehouse Motion, the Debtors request that the Court authorize the Debtors to pay and honor the Lien Claims, and that the Court confirm that the Debtors may pay the Tax Claims charged by the Taxing Authorities or include such payments in the payments to the Lien Claimants.

**H. Consolidated Creditor List Motion**

109. By the *Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, and (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors; (II) Implementing Certain Procedures for the Notice of Commencement; and (III) Granting Related Relief* (the "Consolidated Creditor List Motion"), the Debtors request entry of an order (i) authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate

[5] "Taxing Authorities" also includes Missouri, defined below.

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

mailing matrix for each Debtor, and (b) file a consolidated list of the Debtors' thirty (30) largest unsecured creditors in lieu of filing a separate top twenty creditor list for each Debtor; (ii) implementing certain procedures for the mailing of the notice announcing the commencement of these Chapter 11 Cases and the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code; and (iii) granting related relief

110. Most of the Debtors are co-obligors and/or guarantors with each other with respect to their secured debt, and certain contractual, trade debt, and other obligations. For that reason, the Top 20 Lists of the Debtors would inevitably overlap. In addition, certain Debtors have fewer than twenty significant unsecured creditors. Accordingly, the Debtors submit that filing separate Top 20 Lists for each Debtor would be of limited utility, and, instead, the exercise of compiling separate Top 20 Lists for each Debtor would be no more than an unnecessary expenditure of the Debtors' limited time and resources.

**I. Schedules and Statements Extension Motion**

111. By the *Motion of Debtors for Entry of Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs* (the "Schedules and Statements Extension Motion"), the Debtors seek entry of an order extending the period to file its schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements") to October 13, 2026, to allow the Debtors a total of forty-seven days after the Petition Date to file its Schedules and Statements, without prejudice to the Debtors' right to request additional time if necessary.

112. I understand that, absent an extension, the Debtors would be required to file the Schedules and Statements within 14 days of the Petition Date. I also understand that collecting the necessary information to prepare the Schedules and Statements will require an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professionals. While the Debtors, with the assistance of their professional advisors, have mobilized their employees to work diligently and expeditiously to prepare the Schedules and Statements, the 14-day deadline is not achievable under the circumstances of these Chapter 11 Cases. As a practical matter, the Debtors are unable to properly and accurately complete the Schedules and Statements

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

within the initial statutory period. The complexity of the Debtors' business, the number of Debtors, and the requirements of preparing for these Chapter 11 Cases, coupled with the limited time and staff available to the Debtors, necessitates the requested extension of the Schedules and Statements Deadline.

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

I declare under penalty of perjury that the foregoing is true and correct. Executed in Napa, California, on August 28, 2026.

*/s/ Raymond Signorello*
Raymond Signorello

KELLER BENVENUTTI KIM LLP
101 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104